Filed 4/10/26  P. v. Soto CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B338268 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA114218) |
| v. | |
| MICHAEL ALLEN SOTO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed as modified.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Shezad H. Thakor and Kenneth C. Byrne, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Michael Allen Soto was convicted of ten counts relating to domestic violence against two different partners, including attempted murder, kidnapping, and false imprisonment. On appeal, he argues that his conviction on count 9, false imprisonment, must be reversed as a lesser included offense of count 8, kidnapping, because his detention of the victim was a continuous course of conduct. We agree the false imprisonment was a lesser included offense of the kidnapping, so the conviction on count 9 must be reversed.

Soto also contends the trial court erred in sentencing him to the upper term on count 5, attempted murder, because the court relied on aggravating facts that were not found by a jury. The People concede this was error, but assert the error was harmless. We find the error was not harmless beyond a reasonable doubt, and therefore vacate the sentence and remand for further proceedings. As such, Soto's remaining claims of sentencing error are moot and we do not address them.

## FACTUAL AND PROCEDURAL BACKGROUND

## A.     Charges

The People filed an information on June 3, 2020 and an amended information on September 2, 2020 alleging four counts involving domestic violence against a former partner, Erica.[1] While out on bail, Soto was arrested again for domestic violence against a different partner, Rosa. The People moved to consolidate Soto's two cases, and the trial court granted the motion.

---

[1] We refer to the victims by first names to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

2

A second amended information filed May 31, 2022 alleged the following counts: 1. willful infliction of a corporal injury resulting in a traumatic condition upon Erica, a person in a dating relationship with Soto (Pen. Code, § 273.5[2]); 2. misdemeanor contempt of court for knowingly violating a protective order (§ 166, subd. (c)(1)); 3. criminal threats to Erica (§ 422, subd. (a)); 4. mayhem against Erica (§ 203); 5. attempted willful, deliberate, and premeditated murder of Rosa (§§ 187, subd. (a), 664); 6. willful infliction of a corporal injury resulting in a traumatic condition upon Rosa, a person in a dating relationship with Soto (§ 273.5); 7. criminal threats to Rosa (§ 422, subd. (a)); 8. kidnapping of Rosa (§ 207, subd. (a)); 9. false imprisonment by violence of Rosa (§ 236); and 11. misdemeanor contempt of court for knowingly violating a protective order (§ 166, subd. (c)(1)).  Soto's mother, Geraldina Bonilla, was also charged in counts 8 and 9, and was charged in count 10 as an accessory after the fact for the attempted murder.  The information further alleged for counts 1, 5, 6, 7, and 8 that Soto personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)), and for counts 5, 6, 7, and 8 that Soto personally used a deadly weapon in the commission of the offenses.  For counts 1, 3, 4, 5, 6, 7, 8, and 9, the following aggravating factors were also alleged: the offenses involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)[3]); Soto engaged in violent conduct that indicates a serious danger to

---

[2] All undesignated section references are to the Penal Code.
[3] All undesignated rule references are to the California Rules of Court.

3

society (rule 4.421(b)(1)); Soto's prior convictions are numerous or of increasing seriousness (rule 4.421(b)(2)); and Soto was on probation, mandatory supervision, post-release community supervision, or parole when the crime was committed (rule 4.421(b)(4)).

Soto pled not guilty. Just before trial, Bonilla pled guilty to count 8, kidnapping, admitted specific factual grounds for the plea, and admitted factors in aggravation. The court sentenced her to three years' probation. The case against Soto proceeded to a jury trial, and the following evidence was presented.

## B. Trial

### 1. *Crimes against Rosa*

Rosa testified that in July 2021, she had been in a romantic relationship with Soto for about a year. On July 14, she was staying at a sober living home in Los Angeles, but she had been out with Soto doing methamphetamine that day. Rosa returned to the home before her curfew. That evening, Rosa and Soto got into an argument over the phone and Rosa broke up with Soto. Rosa then went to sleep. She woke up at about 3:00 a.m. when another resident saw Soto and said, "Oh my God. He's here again." Rosa testified that Soto told her to come outside, and "he was serious." Rosa said no.

Soto entered the house, and "[e]veryone in the room scattered." A staff member left to call police. Soto told Rosa that the staff would also call her probation officer, which worried Rosa because she had violated probation by spending the day with Soto and taking methamphetamine. Rosa said her natural inclination was to run away, and as she ran Soto grabbed her by the arm. Rosa testified that she did not want to be with Soto, but she also

4

did not want to go to jail for violating probation.  They got into Soto's car.

In the car, Soto told Rosa he had left her 92 messages; she did not know that because her phone had died.  Rosa testified that as they were driving, "he starts socking me, just cracking me" in the head and face.  Rosa tried to punch Soto as he turned a corner, and the car ran into a pole.  Rosa hit the windshield during the crash.  Soto then started beating Rosa severely, "[j]ust beating me like – like I'm nothing. Like I'm nothing. Like a dog. Just beating me," and "I'm just being pummeled."  Soto stopped hitting Rosa and said, "You think you're going to leave me?"  He also said that if she tried to leave he would kill her.

Soto threatened to chop Rosa into little pieces, so there would be "[n]o body, no crime."  Rosa testified that Soto poured carpet cleaner "all over my open wounds," and he "body shot me . . . knocked the wind right out of me" so Rosa couldn't breathe.  Soto took out a Sawzall (a motorized saw), put it to Rosa's neck, and turned it on; Rosa thought she was going to die.  Soto then started looking for pliers or wire cutters, saying he was going to take out Rosa's teeth so she would "remember" him.  Rosa said to Soto, "No.  My eyes are punched shut. I can't even see you coming," and "[J]ust kill me."

Soto stopped the attack.  They "waited a little a bit" then Soto called his mother, Bonilla.  When Bonilla saw Rosa through the window, she started screaming, "Oh, my God, Michael. Oh, my God.  You're going to jail.  You're going to jail.  Oh, my God."  Rosa testified that at this point, Rosa was trying to keep Soto calm until she could get away.  The car had "a tire and a battery issue," apparently from hitting the pole.  Bonilla helped them with the car issues and gave them money for a hotel.

Soto and Rosa went to a Jack-in-the-Box parking lot to wait until their hotel check-in time; they fell asleep in the car. Rosa testified that she was "cringing every single moment" she was with Soto, because she did not want to be with him. Rosa testified that in the Jack-in-the-Box parking lot, Soto "starts fucking me. Imagine my face is like a piece of meat and he wants to have sex." Rosa testified that she did not want to have sex, but she did not say anything in an effort to not upset Soto, because she was "waiting for the moment to escape."

They checked into the hotel. Rosa then accompanied Soto while he went out to steal catalytic converters to sell for money to repay Bonilla. Rosa testified that at one point Soto was outside the car and Rosa was in the car, and it "was the perfect opportunity for me to leave." But she did not try, because she was in "complete fear" of Soto and afraid he might be able to cut the tires before she could get away, in which case "of course he is going to kill me."

They stayed at the hotel for two or three nights. Soto was "still having sex with" Rosa, even though she was in pain and did not want to. Bonilla brought Rosa a bag of ice and salve for her bruises. Rosa testified that her face made an unusual sound when she applied the ice, which alarmed her; she thought, "Oh, my God. My face is broken. There is something in my face broken."

Soto and Rosa needed money to stay another night in the hotel. Rosa told Soto she was in pain and wanted to stay in the room to rest while Soto went out. Soto replied, "You're starting to make me want to beat the shit out of you again." Rosa testified that she placated him because "my body can't take another beating. It can't take another beating. If he beats me up again

6

I'm dead. That's it. I'm dead." So she told Soto she would go with him, but first she needed to stop at a store for ibuprofen and tampons. She "let him think everything [was] cool," thinking that she would be able to go inside the store and ask for help.

When they got to the store, Soto went in alone. Rosa got into the driver's seat of the car and drove away. Rosa drove directly to her mother's house, recklessly fast, because she assumed Soto would follow her and she was afraid her daughter would be in danger if Soto got to her house. Rosa's family members drove her to the police station. Police arranged for an ambulance to transport Rosa to the hospital.

Photos of Rosa's face taken in the hospital were shown to the jury and Rosa testified about them. Rosa described the photos as showing her "after three days of being held hostage." Rosa said her eyes were "punched shut," her nose was broken at "the top and the bottom," her left orbital eye socket was cracked, and "[m]y eyeball is hanging. The back of the muscle is hanging on the crack over the eye socket." She had extensive bruising on her upper body; her legs were not photographed. Another photograph showed marks from the Sawzall blades. Photos of Soto's car were also shown to the jury, including pictures of the wire cutters and Sawzall blades in the car.

Dr. Wayne Dodakian testified about treating Rosa in the hospital. Rosa had "facial abnormalities" as a "result of fractures of the face" and "multiple contusions all over her body"; she was disoriented, in fear, and in severe pain. A CT scan revealed nasal fractures and "orbital blowout fractures" that were "beyond the scope of practice at that hospital." Rosa was transferred to a trauma center for reconstructive surgery. When asked on cross-

7

examination whether Rosa's injuries could be consistent with a car accident, Dr. Dodakian answered, "Absolutely not."

At the second hospital, a titanium plate was surgically inserted into Rosa's face and her broken nose was repaired. Rosa had a second surgery, and testified that she still needed a third surgery on her eye.

Rosa also testified about a separate domestic violence incident with Soto. On September 1, 2020, she was at a hotel with Soto and they got into an argument. Soto took Rosa's keys, and when she tried to get them back, he "pushed me down on the couch and started strangling me." Rosa blacked out. When she returned to consciousness she tried to get away, and Soto said, "I have to kill you. I have to get rid of you. . . . There is [*sic*] too many cases against me. I have to get rid of you." Rosa said, "What are you talking about? I have children." Soto responded, "I don't care." Rosa testified that Soto "tried to snap my neck three times after that." Rosa testified that her windpipe was damaged and it still affects her ability to sing. The jury was shown a photograph of strangulation marks on Rosa's neck. Rosa broke up with Soto for two weeks after that, but she ended up getting back together with him. The court took judicial notice of Soto's December 9, 2020 conviction for injuring a partner under section 273.5, subdivision (a).

Los Angeles Police Department (LAPD) detective Michael Villareal testified that a criminal protective order was issued on December 9, 2020 requiring Soto to stay away from Rosa.

2.     *Crimes against Erica*

Erica testified that in March 2020 she and Soto had been dating for about a year. On March 14, 2020, Erica and Soto were driving together in a car after visiting some tidepools together.

8

Erica received a text on her phone, which upset Soto. Erica testified that Soto then "took the back of my head and bashed my head into the dashboard." Soto repeatedly hit Erica's face with his fist, put her into a headlock, and threatened to break her jaw. Soto then dropped Erica off at a hospital, and said he was a "nice guy" for doing so. He took Erica's shoes, because he had bought them for her.

Photos of Erica's injuries were shown to the jury. Erica described the photos as showing that she had stitches in her forehead and lip, and she was "bruised everywhere, swollen." Dr. Douglas McFarland testified about the extent of Erica's injuries. Erica suffered blunt force trauma to the face; she needed stitches to her lip and forehead, and plastic surgery for the scars. The lip injury was "very complex" because the lip has a lot of small muscles, and Erica had "non-viable or dead little pieces of tissue hanging off the wound." Dr. McFarland "put in some deep stitches to try to get the muscles back into position" before closing the skin with more stitches. Police spoke with Erica in the hospital, and the jury heard a recording of that conversation in which Erica gave the police Soto's name.

Erica also testified that on August 7, 2019, she was with Soto and her sister. Soto hit Erica, then Erica's sister got involved, and Soto hit her too. Erica's lip was injured and she needed stitches. A Hawthorne Police Department detective testified about arriving on the scene, finding Erica injured, and having her transported to a hospital. LAPD detective Villareal testified that a criminal protective order was issued on November 20, 2019 requiring Soto to stay away from Erica.

The defense did not present any evidence.

9

## C.     Verdict and sentence

The jury found Soto guilty on all counts.  On counts 1, 5, 6, and 8 the jury found true that Soto personally inflicted great bodily injury under circumstances involving domestic violence.  On counts 5, 6, 7, and 8 the jury found true that Soto personally used a deadly weapon.  On count 6, corporal injury of a person in a dating relationship, the jury found true that Soto had a prior conviction.  On count 5, the jury found not true that the attempted murder was willful, deliberate, and premeditated.

The court sentenced Soto to a combined prison and county jail term of 24 years and four months, calculated as follows.  On count 5 (attempted murder of Rosa) the upper term of nine years, plus five years for the great bodily injury enhancement, plus one year for the weapon enhancement; on count 1 (corporal injury of Erica) a consecutive term of one year plus four months on the great bodily injury enhancement; on count 3 (criminal threats against Erica) a consecutive term of eight months; on count 4 (mayhem against Erica) four years stayed under section 654; on count 6 (corporal injury of Rosa) four years, plus four years for the great bodily injury enhancement, plus one year for the weapon enhancement, stayed under section 654; on count 7 (criminal threats against Rosa) two years, stayed under section 654; on count 8 (kidnapping of Rosa) a consecutive term of one year and eight months, plus one year and four months for the great bodily injury enhancement, plus four months for the weapon enhancement; on count 9 (false imprisonment of Rosa) two years, stayed under section 654; on misdemeanor counts 2 and 11, consecutive terms of one year each to be served in county jail at the conclusion of his prison terms; plus a consecutive term of one year for his probation violation.

10

Soto timely appealed.

## DISCUSSION

Soto challenges his conviction on count 9, false imprisonment, on the grounds that it is a lesser included offense of count 8, kidnapping. We agree that count 9 must be reversed. Soto also asserts several sentencing errors. We agree with Soto that the trial court erred in sentencing him on count 5, attempted murder, by relying on aggravating factors that were not proven beyond a reasonable doubt, and that as a result, the matter must be remanded for further sentencing proceedings. That conclusion renders moot Soto's remaining contentions of sentencing error, so we do not address his remaining arguments.

### A. False imprisonment (count 9) as a lesser included offense of kidnapping (count 8)

Soto contends his conviction on count 9, false imprisonment of Rosa, is a lesser included offense of kidnapping, count 8. He asserts that because these crimes arose from a single course of conduct he cannot be convicted of both, so the conviction for false imprisonment must be reversed.[4] "The issue of whether multiple

---

[4] Soto's argument includes several inaccurate statements about the evidence. He contends, for example, that "there was one course of conduct on one day" and "Rosa was held for one day." However, Rosa testified that they spent multiple nights in the hotel, and the hospital photos showed her "after three days of being held hostage." Soto also asserts that Rosa left Soto and the hotel to steal things, but then she came back. This is also incorrect; Rosa's statement about stealing things was a comment about their past relationship, not what occurred in the days Soto was detaining her. These factual inaccuracies do not affect the outcome of this issue.

11

convictions are proper is . . . reviewed de novo." (*People v. Villegas* (2012) 205 Cal.App.4th 642, 646.)

1. *Additional background*

In closing arguments, the prosecutor told the jury that the kidnapping in count 8 occurred when Soto took Rosa to the hotel from the place where the car hit the pole. She argued that by then, Soto had severely beaten Rosa and compelled her to submit to going with him. The prosecutor argued that the false imprisonment in count 9 began with the stay in the hotel room, when Rosa felt she could not leave and was biding her time as she waited to escape. The jury convicted Soto on both counts. The court stayed the sentence on count 9.

2. *Analysis*

"In California, a single act or course of conduct by a defendant can lead to convictions 'of *any number* of the offenses charged.'" (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034, quoting § 954 [italics in *Montoya*].) "But a judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses." (*Ibid*.) "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*People v. Sanders* (2012) 55 Cal.4th 731, 736.) False imprisonment by violence is a lesser included offense of kidnapping. (See *People v. Salazar* (2023) 15 Cal.5th 416, 420.)

The evidence shows that Soto's kidnapping of Rosa was continuous from the time he kidnapped her until she escaped; there was no break in the course of conduct upon their arrival at the hotel. "'[F]orcible detention of a victim is an element of

12

kidnapping and as long as the detention continues, the crime continues." (*People v. Chacon* (1995) 37 Cal.App.4th 52, 60 (*Chacon*); see also *People v. Barnett* (1998) 17 Cal.4th 1044, 1159 ["the crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim"].)

In *Chacon*, for example, the defendant and a companion took a librarian hostage during an attempt to escape a youth authority facility. They put the librarian in a truck and tried to drive away, but a security officer sprayed them with mace. The youths crashed the truck and were apprehended. (*Chacon, supra*, 37 Cal.App.4th at p. 58.) The defendant was convicted of kidnapping and several other crimes. On appeal, the defendant challenged whether the kidnapping involved bodily harm, arguing that some of the victim's injuries did not occur *during* the kidnapping, which was complete once the victim was put into the truck. The court disagreed, holding that as long as the victim was forcibly detained, the kidnapping continued. (*Id.* at p. 60.)

Similarly, in *People v. Thomas* (1994) 26 Cal.App.4th 1328, 1331 (*Thomas*) the court held that "a defendant may be convicted of only one kidnapping offense where there is but one abduction and detention of a solitary victim." There, the defendant apprehended the victim in a mall parking lot, kidnapped her at gunpoint in her car, took her money and wallet, parked and sexually assaulted her, then drove her to her apartment to get her ATM card. The victim escaped and called police; the defendant fled but was later apprehended. (*Id.* at pp. 1331-1332.) The defendant was convicted of two counts of kidnapping based on the prosecution's theory that the first offense, kidnapping for robbery, ended when the defendant parked the car to rape the

13

victim, and the second kidnapping began when he drove the victim to her apartment. (*Id.* at p. 1334.)

The Court of Appeal held that the second kidnapping conviction must be vacated. It stated that although the defendant's "plan for obtaining money from [the victim] may have changed in approach during the course of the kidnapping, the initial kidnapping did not end with the commission of the sexual offenses, and there was only one continuous kidnapping." (*Thomas, supra*, 26 Cal.App.4th at p. 1334.) After discussing other kidnapping cases, the court stated, "In the present case, there was a single abduction, followed by a continuous period of detention. Not until she reached her apartment was [the victim] released from that detention and the danger it presented. That [the defendant] may have changed his approach or focus as to the robbery, uttered a variety of threats to the victim, and engaged in other crimes after the initial abduction did not transform the offense into two kidnappings." (*Id.* at p. 1335.)

On the other hand, the court in *People v. Wiley* (1994) 25 Cal.App.4th 159 held that "it was proper to convict Wiley of both kidnapping for robbery and kidnapping for ransom in a transaction involving a single victim." (*Id.* at pp. 161-162.) In that case, the defendant attempted to rob a victim at an ATM, but the ATM would not dispense money. Wiley then "forced [the victim] into [the victim's] vehicle and drove forward approximately 100 feet. He then forced [the victim] at gun point to drive through the drive up ATM again. When he did so, the ATM refused to dispense any money or to disgorge [the victim's] ATM card. In fear that Wiley would carry out his threat to shoot him, [the victim] agreed to call his wife so she could bring [cash.]" (*Id.* at p. 162.) The wife arrived but reported that she was having

trouble getting the cash. "She departed and [the victim] and Wiley then drove from El Cajon to Alpine to meet her and make the exchange. [The victim] was rescued by sheriff's deputies who had been alerted." (*Ibid.*) Wiley was convicted of kidnapping for robbery for his activities relating to the attempts to get money from the ATM, and kidnapping for ransom for detaining the victim at gunpoint while attempting to extort money for his release. (*Ibid.*)

The Court of Appeal rejected Wiley's argument that the two convictions constituted "an impermissible division of a single crime into multiple offenses." (*People v. Wiley, supra*, 25 Cal.App.4th at p. 162.) The court stated that kidnapping for robbery under section 209, subdivision (b) and kidnapping for ransom under section 209, subdivision (a) "involve different elements and different statutes. . . . Here, the kidnapping for robbery terminated before the detention for extortion began." (*Id.* at pp. 162-163.)

None of these cases is directly on point, because they do not involve lesser included offenses. However, they demonstrate that a kidnapping continues as long as the victim remains detained. Here, Rosa testified that once she was under Soto's control, she was continuously detained and had no opportunity to leave. That continuous detention, and therefore the kidnapping, did not end because the place of detention changed from the car to the hotel.

Soto relies on *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*). There, the defendant grabbed a woman as she walked down the street, carried her to a dark area between two houses, raped her, and ran away when a police officer arrived. (*Id.* at p. 347.) The defendant was convicted of both kidnapping to commit rape and false imprisonment. On appeal, the court stated

15

without further analysis: "The People concede that defendant's conviction for false imprisonment must be vacated for the additional reason that 'false imprisonment is a lesser included offense of kidnapping for rape,' of which defendant also was convicted. Citation.] We agree, as a defendant cannot be convicted of both an offense and a lesser offense necessarily included within that offense, based upon his or her commission of the identical act." (*Id*. at p. 362.)

The People argue that this case is not like *Jandres*, because Soto's false imprisonment of Rosa in the hotel was not based on the "identical act" as the kidnapping. They argue that the hotel is the place where "asportation ceased," so the kidnapping was complete and the false imprisonment began. However, the People cite no authority in support of this argument, and we have found none. Thus, because false imprisonment is a lesser included offense of kidnapping, and the kidnapping of Rosa continued until she escaped, the false imprisonment conviction on count 9 must be reversed. (See *People v. Sanders, supra*, 55 Cal.4th at p. 736.)

## B. Upper term on count 5, attempted murder

Soto contends the trial court erred when it relied on aggravating facts that were not found by a jury to support the high term on count 5. The People agree this was error, but contend the error was harmless. We find the error was not harmless beyond a reasonable doubt, and therefore remand is warranted.

### 1. *Additional background*

While the jury was deliberating, the court asked the prosecutor whether she would be "proceeding with any of the

16

aggravating factors that require a jury to make a determination." The prosecutor said no, she would "proceed on the court ones."

Section 1170, subdivision (b)(2) states that when a statute allows for a low, middle, and high term, the court shall impose the middle term unless "there are circumstances in aggravation of the crime that justify the imposition of" the upper term. Rule 4.421(b) sets out several aggravating factors relating to a defendant: "(1) The defendant has engaged in violent conduct that indicates a serious danger to society; (2) The defendant's prior convictions . . . are numerous or of increasing seriousness; . . . . (4) The defendant was on probation, mandatory supervision, postrelease community supervision, or parole when the crime was committed; and (5) The defendant's prior performance on probation, mandatory supervision, postrelease community supervision, or parole was unsatisfactory."

At the sentencing hearing, the court took judicial notice of Soto's record of arrests and prosecutions, or "rap sheet." The court noted that Soto had been on probation for section 273.5 domestic violence incidents at the times he committed these crimes. The court also observed that in 2017 Soto sustained convictions for assault with a deadly weapon and contempt of court relating to domestic violence, and he sustained additional convictions in 2019 and 2020. The court stated that it found beyond a reasonable doubt that Soto showed an increasing and violent criminal history, he posed a danger to society, and he does not perform well in probation or on parole. The court said it was "[u]sing one of the aggravating factors" to choose the high term on count 5, and "using an aggravating factor" to choose the high term on the great bodily injury enhancement.

17

### 2.	*Analysis*

At the time of sentencing, in early 2024, controlling case law held that "'*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt.'" (*People v. Wiley* (2025) 17 Cal.5th 1069, 1079-1080 (*Wiley*), quoting *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [emphasis in *Wiley*].)  In June 2024, the United States Supreme Court decided *Erlinger v. United States* (2024) 602 U.S. 821 (*Erlinger*), holding that "[v]irtually 'any fact' that "'increase[s] the prescribed range of penalties to which a criminal defendant is exposed'"'"—including certain details relating to prior convictions—"must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." (602 U.S. at p. 834.)  Thus, in sentencing "a judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.'"  (*Id.* at p. 838.)

While this appeal was pending, our Supreme Court followed *Erlinger* in *Wiley, supra*, 17 Cal.5th 1069, holding that under the reasoning of *Erlinger*, "a defendant is entitled to a jury trial on all aggravating facts, other than the bare fact of a prior conviction and its elements,[ ] that expose the defendant to imposition of a sentence more serious than the statutorily provided midterm." (*Id.* at p. 1086.)  The court further held that when a defendant "is deprived of a jury trial on aggravating facts used to justify imposition of an upper term sentence, the reviewing court must apply the *Chapman*[5] standard of review. [Citations.]  Under that standard, 'a sentence imposed under ...

---

[5] See *Chapman v. California* (1967) 386 U.S. 18.

section 1170(b) must be reversed and remanded unless the reviewing court concludes beyond a reasonable doubt that a jury, applying that same standard, would have found true all of the aggravating facts upon which the court relied to conclude the upper term was justified, or that those facts were otherwise proved true in compliance with the current statute.'" (*Id*. at p. 1087, quoting *People v. Lynch* (2024) 16 Cal.5th 730, 743 (*Lynch*).)

The People concede that under the reasoning of *Wiley*, the trial court erred by relying on aggravating facts that were not found by a jury. However, they argue the error was harmless beyond a reasonable doubt.

*Wiley* is instructive, because it has similar facts. In that case, to justify the imposition of an upper term, the trial court cited Wiley's "'prior convictions, [his] poor performance on probation, and the fact that the charges are becoming more serious.'" (*Wiley, supra*, 17 Cal.5th at p. 1077.) The Supreme Court rejected this conclusion, noting that whether Wiley's crimes showed "'increasing seriousness'" (rule 4.421(b)(2)) required "a comparison and evaluation of the relationship among a defendant's prior convictions, and a determination as to their relative seriousness." (*Wiley, supra*, 17 Cal.5th at p. 1082.) Those factors must be assessed by a jury; such a finding "involves something more than a narrow factual finding that the convictions were sustained and what elements were required to prove them," which is the limitation on a court's power under the reasoning of *Erlinger*. (*Ibid*.) The same was true for the finding that Wiley's performance on probation had been "unsatisfactory" (rule 4.421(b)(5)), because "even where a finding of unsatisfactory probation performance is based on conviction of a new offense, it

19

is not strictly limited to that fact.  Rather, it must be proven that the defendant was ordered to serve a term of probation and remained on probation at the time he or she committed the new offense.  These facts, too, go beyond the mere existence of a prior conviction and its elements."  (*Wiley, supra*, 17 Cal.5th at p. 1083.)

*Wiley* found these errors prejudicial because "a rational juror could conclude that the People had not proved beyond a reasonable doubt that Wiley's convictions were of increasing seriousness."  (*Wiley, supra*, 17 Cal.5th at p. 1089.)  The court acknowledged that "the evidence may have been sufficient" to support such a finding, but "that is not the proper inquiry when assessing prejudice under *Chapman*.  [Citation.]  Instead, we must ask 'whether any rational fact finder could have come to the opposite conclusion.'  [Citation.]  A rational juror could have reached the opposite conclusion here based on the totality of Wiley's criminal conduct and the applicable sentences for those transgressions."  (*Id*. at p. 1090.)

The court held that the same was true for Wiley's performance on probation.  The People argued that no rational juror could conclude that being arrested while on probation constituted satisfactory performance.  (*Wiley, supra*, 17 Cal.5th at pp. 1090-1091.)  The court disagreed, noting that because the record showed a mixed performance on probation the court could not "discount the possibility that either counsel in a contested jury trial might have presented live testimony on this factor that would have affected the jury's determination.  [Citation.]  Nor can we discount the possibility that a rational jury could have disagreed as to whether the People had proved that Wiley's

overall performance on probation was unsatisfactory." (*Id*. at p. 1091.)

Following the reasoning of *Wiley*, we also cannot determine beyond a reasonable doubt what a jury might have concluded regarding the aggravating facts the court cited in support of its imposition of the high term on count 5. Soto argues, for example, that a jury might not have concluded that Soto's violent conduct "indicates a serious danger to society" (rule 4.421(b)(1)), because his violent conduct was directed toward his romantic partners rather than society in general. There is also no evidence in the record about Soto's performance on probation, other than the evidence of the crimes herein. We "'cannot assume that the record reflects all of the evidence that would have been presented to the jury, or that the defendant had the same incentive and opportunity at a sentencing hearing to contest the aggravating circumstance.'" (*Lynch, supra*, 16 Cal.5th at p. 775.) Thus, we are unable to find the error harmless beyond a reasonable doubt.

When aggravating facts were not tried to the jury and the error was not harmless beyond a reasonable doubt, the proper remedy is to remand to give the People an opportunity to retry the aggravating facts. (*Lynch, supra*, 16 Cal.5th at p. 776.) "On remand, the parties remain free to introduce at trial all relevant evidence to support or contest the factual support for the aggravating circumstances set out in the California Rules of Court. The court may rely on any properly proven aggravating facts, including prior convictions or facts necessarily found by the jury to support a verdict on underlying counts and enhancements. The court retains its discretion to impose an upper term sentence if it concludes that one or more properly proved circumstances justify such a sentence. (§ 1170(b)(2).) If it

cannot so conclude, it may impose no more than a middle term for each of the counts on which [Soto] stands convicted. (*Id.*, subd. (b)(1).)" (*Lynch, supra*, 16 Cal.5th at pp. 777-778.)

## C. Soto's remaining sentencing claims are moot

Because we remand for further proceedings and resentencing on count 5, we need not address Soto's remaining claims of sentencing error. "[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.'" (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) As such, Soto's remaining claims of error relating to his sentencing are moot.

## DISPOSITION

Soto's conviction for false imprisonment of Rosa, count 9, is reversed. The judgment is otherwise affirmed. The sentence on attempted murder, count 5, is vacated. The matter is remanded for further sentencing proceedings as discussed herein.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, ACTING P. J.

We concur:

MORI, J.

TAMZARIAN, J.

22